**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Jose CASTRO and Anna Castro, Defendants-Appellants.**

**Nos. 85–1963, 84–1990.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 4, 1985.

Decided April 17, 1986.

David Kirk, Danville, Ill., Everett L. Laury, Hutton, Laury, Hesser & Lietz, Danville, Ill., for defendants-appellants.

Frances C. Hulin, U.S. Atty., Danville, Ill., for plaintiff-appellee.

Before FLAUM and RIPPLE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

RIPPLE, Circuit Judge.

Following an undercover investigation, the government charged Jose (Kiki) Castro with: count I—conspiring, from about January 1, 1984 through approximately July 31, 1984, to possess with intent to distribute and to distribute cocaine and heroin; count II—distributing heroin on or about June 29, 1984; and count III—distributing heroin on or about July 11, 1984. The government also charged Mr. Castro's wife, Anna Castro, with counts two and three. On April 10, 1985, a jury convicted both defendants of all charges against them. The defendants appeal the district court's denial of several post-trial motions which alleged prejudicial trial errors. Af-

ter carefully reviewing the entire record, we find no reversible error. The defendants received a fair trial; their convictions are affirmed.

## I

### FACTS

At trial, the government's witnesses described a system for transporting drugs from Chicago to Danville, Illinois which involved both Jose and Anna Castro. The investigation, culminating in these convictions, began in mid-June 1984. On several occasions, Vermilion County Metropolitan Enforcement Group (MEG)[1] Agent Frank Sporich purchased narcotics from Junior Ray Duckworth. These transactions took place in a house located at 605 North Walnut Street in Danville, Illinois. Following several such transactions, Agent Sporich arranged to follow Mr. Duckworth to a contact from whom he could purchase an ounce of heroin. Pursuant to this plan, on June 29, 1984, Mr. Duckworth and Agent Sporich traveled to the Getty Truck Stop near Kankakee, Illinois. At the truck stop, Agent Sporich purchased heroin from an individual driving a silver station wagon. Agent Sporich later identified that individual as Jose (Kiki) Castro.

Several other agents surveilled the truck stop during the transaction. After the transaction, MEG Agent Dennis Haley remained behind to observe the silver station wagon. Agent Haley followed the car to 703½ Harmon Avenue in Danville, an apartment rented by Mr. Duckworth and his wife, Jeanne. He observed Junior Ray Duckworth, Jose Castro, Anna Castro and several small children exit the car and enter the apartment. Several days later, on July 5, 1984, Agent Haley also observed Mr. Duckworth and Mr. and Mrs. Castro on the porch of the Castros' home in Chicago. Photographs taken during this observation were introduced as government exhibits 50 and 51.

Special Agent William Haley of the Illinois Division of Criminal Investigations (DCI) testified that he was also involved in the undercover investigation of the Duckworths and the Castros. During a June 24, 1984 meeting at the Walnut Street house in Danville, Agent Haley purchased a quarter ounce of heroin from Mr. and Mrs. Duckworth. On July 2, 1984, Agent Haley again purchased a quarter ounce of heroin at the same location. This time, Mr. Duckworth and Mr. Castro were present, and Mr. Castro set the price and terms of the sale. Agent Haley also testified that, during the July 2 transaction, he observed Mrs. Castro on the back porch of the Walnut Street home.

On July 11, 1984, the investigation culminated when Agent Sporich met Mr. Duckworth at the Walnut Street house to purchase heroin. Agent Sporich testified that, during the transaction, Mr. Duckworth left the home and returned with the drugs. Immediately following the sale, agents arrested the occupants of the house including Mr. Duckworth and Mr. Castro. A subsequent search of the silver station wagon uncovered cocaine. Agents also searched the Duckworths' Harmon Avenue apartment. They found drugs in Mrs. Duckworth's purse and arrested both Mrs. Duckworth and Mrs. Castro who were in the apartment when agents arrived.

The government did not rely solely on the agents' testimony. Herman Franklin, Jeanne Duckworth and Junior Ray Duckworth, all involved in the conspiracy to distribute, supplied the details of the operation. Herman Franklin who lived near the Castros in Chicago, testified that, on several occasions in early 1984, he went to the Castros' home to pick up some heroin for personal use. According to Mr. Franklin, he usually obtained it from Mr. Castro but, on occasion, did business directly with Mrs. Castro. He testified that he introduced Junior Ray Duckworth to Mr. Castro in early 1984 and that he made several trips

---

1. The Vermilion County Metropolitan Enforcement Group is a combined city and county unit investigating drug offenses. Tr. at 224.

to Danville with Mr. and Mrs. Castro. On at least one occasion, he observed what he believed to be a drug transaction. Mr. Franklin testified that, typically, Anna Castro remained in the car during these trips.

Pursuant to a plea agreement, Jeanne Duckworth testified against the Castros. She stated that she had picked up narcotics at the Castros' Chicago home from both Jose and Anna Castro. She also testified that, on the morning of July 11, 1984, she witnessed what she believed to be the preparation of drugs for delivery. Jose and Anna Castro as well as Junior Ray Duckworth were huddled in the corner of the Castros' kitchen with scales, tin foil, baggies and a shaker filled with some powder. She made several trips with the Castros to Danville. The last trip was on the day of the arrest, July 11. On that day, she accompanied Mrs. Castro and their children to the Harmon Avenue apartment to wait for Mr. Castro and Mr. Duckworth. Mrs. Duckworth also told the jury that, on the trips to Danville, the group transported packages of drugs.

The key government witness was Junior Ray Duckworth. Although he claimed his memory was partially affected by an unrelated accident, he implicated both Jose and Anna Castro in the distribution operation. His testimony corroborated many of the other witnesses' statements. He testified that, after Mr. Franklin introduced him to the Castros in mid-1984, he obtained drugs from them on several occasions. Mr. Duckworth agreed to help Mr. Castro transport heroin and cocaine to Danville. According to Mr. Duckworth, Mrs. Castro knew the purpose of these trips and, with Mrs. Duckworth and the children, accompanied them to reduce suspicion. Mr. Duckworth confirmed that Mr. Castro met him at the Getty Truck Stop and sold heroin to Agent Sporich on June 29. Mr. Duckworth also testified that, on July 11, 1984, he sold the drugs to undercover Agent Sporich. Mr. Duckworth claimed that, although he had previously met the agent, he did not recognize him at the time of the sale. Mr. Duckworth stated that, during the transaction, he left the Walnut Street house and went to the Harmon Avenue apartment where Anna Castro gave him the cocaine and heroin which she had been keeping in her purse. He sold the heroin to Agent Sporich and left the cocaine in the silver station wagon, where it was recovered by agents in the search following the arrests.

Jose Castro presented no witnesses. Anna Castro, with the aid of an interpreter, testified on her own behalf. She admitted that she knew Herman Franklin and the Duckworths. She also acknowledged that she accompanied her husband on several trips to Danville. However, she claimed each trip had an innocent purpose and denied any involvement in a drug distribution operation. She also claimed that she was not aware that her husband or the Duckworths were transporting drugs to Danville. The jury chose not to credit her testimony and found both Jose and Anna Castro guilty of the counts charged against them.

On appeal, the defendants do not contest the sufficiency of the evidence against them. Instead, the defendants allege numerous trial errors. These alleged errors can be grouped into four categories. First, the judge restricted defense counsel's ability to cross-examine adequately the government's witnesses. Second, the judge made inappropriate statements to the jury. Third, the prosecutor argued facts not introduced into evidence. Finally, the judge erroneously prohibited Anna Castro from answering important questions during direct examination. We will consider each category of alleged error.

## II

### LIMITATION ON CROSS–EXAMINATION

■ The defendants argue that the district judge restricted their ability to cross-examine key government witnesses. Junior Ray Duckworth provided potentially the most damaging evidence against the defendants. On appeal, the defendants cite to examples in which the court sustained government objections to a line of ques-

tions and directed defense counsel to ask a different question. In each instance, defendants argue that the court improperly restricted their ability to test Mr. Duckworth's credibility. While we recognize that defense counsel should be afforded every opportunity to effectively cross-examine a government witness, we must also rely on the experience of an attentive district judge to control excesses in cross-examination. The "management of cross-examination is peculiarly committed to the district court's discretion," *United States v. Silva*, 781 F.2d 106, 110 (7th Cir.1986) (quoting *United States v. Murphy*, 768 F.2d 1518, 1536 (7th Cir.1985)); *see also Delaware v. VanArsdall*, —— U.S. ——, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). An examination of the specific limitations on cross-examination reveals that the district judge did not abuse his discretion.

■ During cross-examination, Mr. Duckworth admitted that in 1979 he sold drugs to MEG agents including Agent Sporich. On separate occasions, defense counsel attempted to question both Mr. Duckworth[2] and Agent Sporich[3] about their 1979 relationship. The defendants argue that, had they been permitted to ask the questions posed, the answers might have revealed that Mr. Duckworth was working in collusion with the government agents in 1984. However, Mr. Duckworth denied recognizing Agent Sporich in 1984. Tr. at 214. He blamed his poor memory on injuries sustained in a fire. The district court

---

2. MR. LAURY: Q Isn't it true, Mr. Duckworth, that you have met the same Frank back in 1979?

A Yes, it's true.

Q And isn't it true that he was introduced to you by a MEG agent by the name of Carey Spicer?

MS. HULIN: Objection as to relevance.

THE COURT: He may answer.

MS. HULIN: Time, year.

THE COURT: 1979 was the time he said.

A Yes, this is true.

MR. LAURY: Q And isn't it true back in 1979 you were dealing in drug traffic with this individual, Carey Spicer, who you later found out to be a MEG agent?

A Yes, it's true.

Q And when Mr. Spicer introduced you to this man Frank, he introduced you to him as his brother-in-law, isn't that right?

A That I don't remember.

MS. HULIN: I'm going to object as to the relevance of the introduction of '79.

THE COURT: Sustained as to relevance.

MR. LAURY: Q Isn't it true, Mr. Duckworth, that you drove with Mr. Spicer and this Frank and another individual in February of 1979 from your home in Danville to Decatur to make a purchase of heroin?

MS. HULIN: Objection.

THE COURT: Sustained. Relevance.

MR. LAURY: Q Well, shortly after your dealings with Mr. Spicer, you were arrested on these drug charges for which you pled guilty in 1979?

MS. HULIN: Your Honor, I object again. And I ask that counsel be directed to discontinue with the questions. The questions keep being presented, even though the objection is sustained.

THE COURT: Objection is sustained. Go to another subject.

---

MR. LAURY: Q Mr. Duckworth, after you were arrested in 1979, you knew Mr. Frank was a MEG agent, did you not?

A Your Honor, I want to answer in the narrative.

THE COURT: You don't know?

A I—after the fire, I was getting ready to say, I lost my memory. I have to explain it to the Court what happened, and I can't explain it. I can't answer that.

THE COURT: He can't answer the question. That answer stands.

MR. LAURY: Q Now, it's your testimony here today that in the spring of 1984 you did not know Frank was a MEG agent?

A No, I didn't. I wouldn't have had anything to dow [sic] with him. I didn't remember the man.

Tr. at 212–14.

---

3. Q You had known Mr. Duckworth back in '79, did you not?

A Yes, I did.

Q And you were introduced to him by Agent Carey at that time, Carey Spicer?

A I believe so, yes.

Q You were working for MEG back then, were you not?

A Yes, I was.

Q And as a matter of fact you drove Mr. Duckworth to Decatur and Mr. Spicer back in February of 1979?

MS. HULIN: Objection.

THE COURT: Sustained as to relevance.

MR. LAURY: Relevancy, Your Honor?

THE COURT: Relevance. What fact of consequence in this case does that tend to prove? Ask another question.

MR. LAURY: I have no other questions, Your Honor.

Tr. 243–44.

correctly held that the defendants had established Mr. Duckworth's prior relationship with the MEG agents but that any further testimony concerning his activities in 1979 was not relevant to the conspiracy alleged to have existed from January to July 1984.

■ Similarly, the defendants argue that they should have been permitted to explore Mr. Duckworth's past employment with the DCI. Testimony revealed that, during 1983, Mr. Duckworth received compensation for assistance in several drug investigations. The court, out of the presence of

the jury, gave defense counsel the opportunity to connect Mr. Duckworth's past employment to the 1984 conspiracy with the Castros. Mr. Duckworth denied any involvement with the DCI in 1984. Therefore, the court instructed defense counsel to pursue a different line of questions. The district court correctly held that, unless the defendant could establish that the witness worked for the DCI in 1984, further testimony was not relevant to the case before the court.[4]

■ The defendants attempted to inquire into the specific counts involved in

---

4. Q But I'm asking for you now, did you work with them for a little over a year, regardless of what you said?
A No.
Q They paid you for working for the DCI at that time, did they not?
A Yes, they did.
Q How much did they pay you?
A Again, they didn't. I didn't get paid this specific amount of money. I got paid for jobs that I was doing.
THE COURT: Is there any way that you intend to connect up payment to him with this case?
MR. LAURY: Yes, sir.
THE COURT: You may proceed.
MR. LAURY: Q So you got paid based on the work on an individual bust, is that right?
A Buys.
MS. HULIN: Your Honor, I would object and ask for an offer of proof.
THE COURT: Sustained. Take the jury out.
OPEN COURT
WITHOUT THE JURY
THE COURT: All right. Out of the presence of the jury. What is it that you are going to prove, that he was in the employ and pay of the DCI between January of '84 and July 11th of '84?
MR. LAURY: That he was within the employ at the DCI at that time, working through Mr. Grant.
THE COURT: How are you going to prove this? Ask a question. You may make an offer of proof out of the presence of the jury.
MR. LAURY: As I understand it, Your Honor, you want the offer of proof to connect it up with this?
THE COURT: I want you to demonstrate to me that this witness was in the employ of the Division of Criminal Investigation of the State of Illinois between January of 1984 and July 11th of '84. That's the thrust of your questioning. That is what you told me you would do.
MR. LAURY: Q Mr. Duckworth, you were working and receiving money from the DCI during that period of time, isn't that right?

THE COURT: During what period of time?
MR. LAURY: During the period of at least early 1983, it would be.
A Yes.
THE COURT: Mr. Duckworth, were you employed by the Division of Criminal Investigations of the State of Illinois between January 1, 1984, and July 11th, 1984?
A No.
MR. LAURY: May I ask another question, Your Honor, in that regard?
THE COURT: What relevance? You developed the fact that he was in the employ of them at some time, but he has never received any benefits in connection with this case. It certainly is something to be weighed in judging his credibility that at some prior time not only has he been an abuser, but that he has had connections with law enforcement people. That has relevance in judging his credibility, but to introduce what is false information that he was employed between January 1 of '84 and July 11th of '84 I'll not permit.
MR. LAURY: I won't proceed at this time with any more questions about the DCI. This might come up again.
THE COURT: If it comes up again, fine, but at this point you're unable to establish any payments to him, any compensation that he received between January 1 of '84 and July 11th of '84.
Bring the jury back.
Pursue a different line of questioning.
OPEN COURT
JURY PRESENT
THE COURT: The objection is sustained, ladies and gentlemen of the jury, and defense counsel cannot show that between January 1 of '84 and July 11th of '84 Mr. Duckworth was in the employ or payment of the Criminal Division of the State of Illinois. He cannot do it by this witness.
Ask another question.
Tr. 183–86.

Mr. Duckworth's 1979 conviction for selling drugs. Defense counsel wanted to establish that, in 1979, Mr. Duckworth sold not only heroin but also cocaine. The judge, citing Fed.R.Evid. 609, refused to permit specific questions about the 1979 convictions. The court correctly limited cross-examination to the facts of the conviction rather than allowing counsel to explore the details. A court should not permit counsel to explore the details of a witness' past conviction. *United States v. Dow*, 457 F.2d 246, 250 (7th Cir.1972). The jury was aware that Mr. Duckworth was convicted of selling drugs in 1979. It was able to take that evidence into consideration when it weighed his credibility. Any confusion over the precise type of drugs involved in the 1979 Duckworth conviction does not require reversal of the Castros' convictions.[5]

The defendants attempted to elicit whether Mr. Duckworth had any other source for drugs in Chicago. They attempted to use sealed grand jury testimony to establish that Mr. Duckworth had other sources for drugs. The court concluded that nothing in Mr. Duckworth's grand jury testimony indicated a source of supply other than Jose Castro. Tr. at 172. Mr. Duckworth denied having any other source in 1984. When defense counsel continued his questions about other possible suppliers, the court sustained objections on the ground of relevance and asked defense counsel to place a time frame on his questions consistent with the period in the indictment. Defense counsel voluntarily abandoned this line of questioning.[6] The

---

**5.** Q Back on—you testified concerning a previous conviction for drugs back in 1979, this is in the Circuit Court of Vermilion County here, was it not?
A Yes, it was.
Q And there was a six-count indictment brought against you for not only the sale of heroin but one of the counts involved the sale of cocaine, did it not?
Ms. Hulin: Objection.
The Court: Sustained. Read Rule 609, Federal Rule of Evidence 609. The objection is sustained.
Mr. Laury: Your Honor, the purpose—
The Court: You may inquire as to convictions, period.
Mr. Laury: The purpose he testified about—
The Court: Not about the purpose of anything on other counts and so forth have no bearing on it. Go on to another subject. It's an improper question. Ask another.
Mr. Laury: Q You pled guilty back in 1979 to the distribution of cocaine, did you not?
Ms. Hulin: Objection, Cumulative.
The Court: Sustained.
Mr. Laury: Q You pled guilty to six counts of an indictment in 1979?
Ms. Hulin: Objection.
The Court: Sustained. Go to a different subject.
Mr. Laury: Q You testified you were sentenced to six years?
The Court: That's cumulative. I'm going to curtail the cross-examination until you go to a different subject.
Tr. at 210–11.

**6.** The Court: The transcript of the testimony of Jr. Ray Duckworth, November 8, 1984, before the Grand Jury of this District is sustained. There is nothing in the testimony to indicate a source of supply other than the defendant, Jose Castro. He had knowledge of other people, but there is nothing in that testimony that indicates that he ever procured drugs from persons other than the defendant, Jose Castro.
Mr. Kirk: May I ask him that question, did he procure drugs from others?
The Court: Yes, but I'm not going to let you go into that transcript or into the testimony that's there.
Mr. Kirk: All right. Can I ask it now, since we're out of the presence of the jury?
The Court: Very well.
Mr. Kirk: Q Mr. Duckworth, the individual was called the man with the beeper, you did go to his manufacturing center?
A Me?
Q Yes. Didn't you testify before the Grand Jury?
A I went someplace, but I don't know where I went.
Q The time that you were blind followed [sic], and you saw all of this?
A But I don't know where I was.
Q Is that the same individual that you talked to?
The Court: That isn't the question that you were going to ask him.
Mr. Duckworth, did you procure drugs for sale from anyone other than Mr. Jose Castro?
A No, sir.
The Court: Bring the jury back. The objection is sustained.
OPEN COURT
JURY PRESENT
The Court: All right. Ask another question. The objection is sustained.
Ask another question.
Mr. Kirk: Q Mr. Duckworth, is it your testimony that you never procured drugs from anyone other than Mr. Castro?

defendants could not establish that, during the period from January to July 1984, Mr. Duckworth obtained drugs from anyone other than Mr. Castro. The danger of confusing the jury with collateral issues requires some showing of relevance before counsel can proceed with a line of questions. The district court provided the defendants with ample opportunity to establish the relevance of their questions. Absent such a showing, the court correctly sustained the government's objections.

■ Defendants object to the court's time limitation on the cross-examination of Mr. Duckworth. The district judge told defense counsel that he was going to terminate the cross-examination at 1:30. Tr. at 212. Defendants argue that this prejudiced their ability to conduct a proper and thorough cross-examination and suggested to the jury that further impeachment of this witness would be futile. As a general rule, establishing a time limitation on cross-examination in open court is not a wise practice. However, in this case, the court's comment was not prejudicial. Our own review of the record convinces us that the trial judge was quite cognizant of his responsibility to afford the defendants wide latitude in cross-examination. Tr. at 162. Indeed, the record reflects a long, complete and thorough cross-examination, and we note that the defendants have never suggested specific questions which they would have asked in the absence of a time limitation. Under these circumstances, we can hardly fault the trial judge for fulfilling his responsibility to prevent the inquiry from going so far afield that it would have confused the jury and wasted valuable time.

■ Finally, the defendants argue that they should have been permitted to inquire into the circumstances surrounding the photographing of Jose Castro, Anna Castro and Junior Ray Duckworth in front of the Castros' Chicago home (Government Exhibits 50 & 51). Defendants wanted to question the photographer about the duration of his surveillance and the order in which the photographs were taken. The court considered the questions irrelevant.[7] These

---

Ms. Hulin: Objection.

The Court: Sustained to the form of the question. It's inaccurate. Ask another.

Mr. Kirk: Q Mr. Duckworth, did you procure drugs from anyone other than Mr. Castro?

Ms. Hulin: Objection, again.

The Court: Sustained. You have to make a time frame and be more precise in the question.

Mr. Kirk: All right, Your Honor.

Mr. Kirk: Q Mr. Duckworth, did you ever purchase any drugs from Herman Franklin at any time?

A Yes, I did.

Q So you have purchased drugs from someone other than Mr. Castro?

Ms. Hulin: Objection.

The Court: Sustained. It's clear he has, but we're concerned here with the time frame that is set out in the indictment.

Mr. Kirk: Q Mr. Duckworth, referring you to the testimony that you made about the Kankakee truck stop, you testified that you went up to the truck stop with who?

A With an agent named Frank.

Tr. at 172–75.

7. Mr. Laury: Q Well, who took the pictures?

A Agent William Haley took them. I was present.

Q How—what time of the day were they taken?

A There were taken approximately 1:30 in the afternoon.

Q Was there any length of time that you waited before taking those pictures?

Ms. Hulin: Objection.

The Court: I don't see the relevance.

Mr. Laury: Frankly, I don't see the relevance in the pictures.

The Court: The jury will disregard your remark about that. I'm asking you about why you're asking the question. The photograph depicts what it shows, and whether they waited two days or two minutes to get the picture doesn't seem to have any bearing on it. The objection is sustained.

Mr. Laury: Q In both of these pictures you said you saw Anna Castro?

A That's correct.

Q Is that her back in—can you identify where in the pictures you see Anna Castro?

A In photograph 50 Anna Castro is sitting right here. You see her side facing Jr. Ray Duckworth.

Q And you're indicating the left part of the porch, is that right?

A That's correct.

Q You observed her as you were filming her?

A That's correct.

Q Is she sitting in a chair?

A Yes, she is.

Q On her own porch?

pictures, while certainly admissible, were of limited importance. They simply establish that, on a specific day and at a specific time, Mr. Duckworth was at the Castros' home in Chicago. Standing alone, they hardly establish a conspiracy; as the trial judge noted, "a brick is not a wall." Tr. at 291. The limited value of these photographs was a matter to be argued to the jury, and we cannot say that the trial judge committed reversible error by refusing extensive cross-examination.

The district court did not unduly limit the defendants' right to cross-examine the government's witnesses. The record indicates that the district judge carefully monitored the trial. The defendants cannot establish in any concrete way that the court's rulings prejudiced their trial. The jury had ample evidence to judge the credibility of the witnesses.

ants attempted to establish that the Duckworths might have believed they would receive a reduced sentence in return for favorable testimony in the Castro trial. In response to defense counsel's statement during closing arguments,[8] the judge instructed the jury that the law did not permit him to reduce the Duckworths' sentences. They were fixed and would not be changed. The judge made these comments out of a justifiable apprehension that the jury might be confused by defense counsel's questions and arguments. The parties had completely explored and resolved this issue during an earlier conference outside the presence of the jury. Tr. at 206–08. The judge did not comment on the witnesses' credibility. He simply made an accurate ·statement of the court's lack of power to reduce the witnesses' sentences.

### III

### JUDGE'S COMMENTS TO THE JURY

 The defendants argue that the judge should not have told the jury that the Duckworths' sentences could not be reduced on the basis of testimony given at the trial. On several occasions, the defend-

A That's correct.
Q And where abouts do you see her in the other picture, Exhibit 51?
A Exhibit 51 she's sitting at the same location and Jose Castro is turning talking to her.
Q Now, how far apart were the pictures taken? I mean, time wise, when you took one picture and then took the other, and in what time span was that?
A Approximately five minutes.
Q How long was Anna Castro sitting on that porch, to your observation, during that time span?
Ms. Hulin: Objection. It's beyond the scope.
The Court: Sustained. Sustained. And relevance. I do not want to make any more comments. I have ruled. Ask another question.
Mr. Laury: Q In one picture—which picture was taken first, is it 50 or 51?
A Exhibit 50 was taken first.
Q And that one Mr. Duckworth was seated on the porch, is that right?
A That's correct.
Q Do you know how long he was seated there?

### IV

### PROSECUTOR'S ARGUMENT

 During closing arguments, counsel for Anna Castro objected to the prosecutor's characterization of his client's role in the conspiracy. The prosecutor argued that Mrs. Castro claimed to have no knowl-

Ms. Hulin: Objection.
The Court: Sustained.
Mr. Laury: Q Exhibit 51, it appears that Mr. Duckworth is up walking?
Ms. Hulin: Objection.
The Court: I don't know if that is a question or an observation.
Mr. Laury: Q Is that right.
The Court: Sustained. The photograph speaks for itself.
Tr. 288–90.

8. In closing arguments defense counsel argued:
Let's look at—and they all have something to gain. Now, I know there has been some comments in the course of the last several days, what happened in the beginning. After all, the Judge won't lessen their sentences any more. It's certainly up to the Court's discretion, if there is any reduction to do it—
Ms. Hulin: Objection, Your Honor.
The Court: Sustained. The fact is, the Court cannot reduce their sentence. That is the law. Go ahead.
Tr. at 428.

edge of the drug transactions or what was going on during trips to Danville.[9] The argument was a fair characterization of the facts and reasonable inferences drawn from Mrs. Castro's testimony during direct examination. At several points, Mrs. Castro denied seeing any drugs or having any involvement in the transportation of drugs to Danville.[10] The jury was certainly not compelled to accept the prosecutor's argument.

# V

## LIMITATIONS ON DIRECT EXAMINATION

■ Finally, Anna Castro argues that the court erred by not permitting her to answer the questions: "Ms. Castro, have you ever conspired or agreed with your husband or anybody to sell or possess drugs?" and "Did you during that period of time agree with anybody to sell or possess drugs?" Tr. at 341. Defense counsel asked his client these questions at the beginning of the direct examination. The court sustained the government's objections to the form of the question.[11] In her argument before this court, appellant claims that the trial judge sustained the government's objection on the ground that the question sought an answer to the ultimate issue of the case. Appellants' Br. at 24. It is not clear from the record that this was the basis of the trial court's ruling. If it was the basis of the court's ruling, we

cannot agree. We believe that the defendant should have been allowed to answer the questions. Fed.R.Evid. 704 clearly permits testimony on the ultimate issue whenever it would be helpful to the jury. Except in the most unusual circumstances, we do not believe that the defendant ought to be deprived of the opportunity to deny explicitly the elements of the offense charged. However, in this case, the judge's decision not to allow Mrs. Castro to answer the questions is not reversible error. After the court sustained the objections, the defense counsel was able to elicit detailed testimony from his client on all of the allegations contained in the indictment. Mrs. Castro testified about her role during each trip to Danville. Her testimony refuted the testimony of several government witnesses. If the jury had believed her, it would have exonerated her completely. We also note that, throughout Mrs. Castro's testimony, the trial judge carefully ensured that language difficulties did not impede her from relating her version of the events at issue. Moreover, throughout the trial, the judge recognized the danger of a conviction based not on the evidence against her but on the stronger case against her husband. His rulings reflect his concern that the jury independently evaluate the evidence against Mrs. Castro.

## CONCLUSION

Jose and Anna Castro received a fair trial. The court did not unduly restrict

---

9. During closing arguments the prosecutor stated:

> Anna Castro professes her ignorance of all of this that was going on. Then she tries to disassociate herself from whatever the others might have been doing, and claims to have no knowledge nor any experience or vision of drugs or controlled substances.
> Mr. Laury: I object.
> The Court: Overruled. She may argue.

Tr. at 411.

10. On several occasions during direct examination, Mrs. Castro denied seeing drugs at any time. Tr. at 345, 346, 349, 353, 354, 356, 357, 358.

11. Q Mrs. Castro, have you ever conspired or agreed with your husband or anybody to sell or possess drugs?

■

Ms. Hulin: Objection.
The Court: Sustained. Form of the question.
Mr. Laury: Q Mrs. Castro, you are charged with one of the charges being a conspiracy involving the period January 1, 1984 to July of 1984, to sell or possess drugs for distribution.
The Court: Ask your question in parts. It will help Mrs. Garcia-Serra to translate.
Mr. Laury: Q Did you during that period of time agree with anybody to sell or possess drugs?
Ms. Hulin: Object to the form of the question.
The Court: Sustained.

Tr. at 341.

cross-examination. The judge's instructions to the jury regarding his ability to reduce the Duckworths' sentences did not prejudice the trial. The prosecutor's closing arguments were not an unfair or an inaccurate statement of the evidence. The court's decision not to allow Anna Castro to answer the direct conspiracy and agreement questions was not reversible error. In short, the defendants have not established any prejudice in the trial caused by these alleged errors, whether they are considered individually or cumulatively. Therefore, we affirm the convictions.

AFFIRMED.