**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Francisco ESPINO, Defendant–Appellant.**

**No. 93–3814.**

United States Court of Appeals,
Seventh Circuit.

Argued June 14, 1994.

Decided Aug. 8, 1994.

William J. Lipscomb, Office of U.S. Atty., Milwaukee, WI (argued), for U.S.

Robert J. Dvorak, Dvorak & Fincke, Milwaukee, WI (argued), for Francisco Espino.

Before ESCHBACH, COFFEY, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

A jury convicted Francisco Espino of conspiring to distribute cocaine and marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count I), of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Count II), and of possessing with intent to distribute marijuana and cocaine in violation of 18 U.S.C. § 841(a)(1) (Counts III and IV). The district court sentenced Espino to a total of 211 months' imprisonment to be followed by a five-year term of supervised release. On appeal, Espino claims error in the admission of his opinion testimony, in the jury instruction on conspiracy, and in the prosecutor's closing argument. We affirm because the district court's decision to admit the defendant's testimony was harmless error, and because the remaining claims were waived.

I.

On October 14, 1992, Espino, along with Alfredo Santos, Augustine Munoz, and Oscar Sandoval, was charged in a seven-count superseding indictment. The indictment charged Espino with conspiracy to distribute more than five kilograms of cocaine and marijuana (Count I), money laundering (Count II), and possession with intent to distribute approximately twelve ounces of cocaine and nineteen pounds of marijuana (Counts III and IV). Espino entered pleas of not guilty to the charges.

On December 14, 1992, Espino proceeded to a five-day jury trial with co-defendant Alfredo Santos.[1] The government's case against Espino was presented primarily through the testimony of four cooperating witnesses: Johnny Robles, Anthony Glapa, Lafayette Grady, and Thomas Alvarez. The testimony of the witnesses reflected two time periods of the charged conspiracy. The first period was from 1987 through 1989, while the second period was from 1990 through 1991. Robles, Grady, and Alvarez testified that during the first period, they ordered cocaine from Espino on a regular basis. The cocaine was delivered by either Espino, Augustine, or a person known to them as "Jose." Robles and Glapa testified that during the second period, Espino supplied them both with cocaine and marijuana on a continuing basis.

Thomas Alvarez testified that he began selling cocaine in early 1987. Alvarez identified Espino, whom he knew as "Pancho," as the source of his cocaine. Alvarez met Espino at the Indios Tavern on Milwaukee's south side where Espino worked as a manag-

---

1. The case against co-defendant Oscar Sandoval was dismissed by the government prior to trial.

Co-defendant Augustine Munoz was a fugitive at the time of the trial.

er and bartender. On his first deal Alvarez asked Espino to "front" him one-half of a kilogram of cocaine, that is, to supply the cocaine against Alvarez's promise of payment from the proceeds of resale. Espino agreed to this arrangement and introduced Alvarez to a man named "Jose" who delivered the cocaine to Alvarez at his home in Waukesha, Wisconsin. Alvarez also identified Augustine Munoz as a person who worked with Espino in the drug business.

After the first deal, Alvarez testified that he received one kilogram of cocaine per week from either Espino, Jose, or Augustine. The most cocaine that Alvarez received in one week was three kilograms of cocaine. Alvarez usually called "Jose" or Augustine on a beeper number to arrange for a cocaine delivery. If Alvarez was unable to reach "Jose" or Augustine, he would call Espino, either at home, the tavern, or through Espino's beeper number, because Espino usually knew where "Jose" and Augustine were. "Jose" or Augustine delivered the cocaine to Alvarez who paid them for the cocaine. While Alvarez was initially fronted the cocaine, he eventually was able to pay for the cocaine upon delivery.

Alvarez testified that in 1989, he traded a 1976 Corvette to Espino for twelve ounces of cocaine. Alvarez negotiated the deal with Espino at Espino's home in Milwaukee. Three or four days later, Augustine and "Jose" brought the cocaine to Alvarez in exchange for the car. The title records introduced into evidence showed that on August 25, 1989, a 1976 Corvette was transferred from Alvarez's wife to Espino. Based on all the circumstances, Alvarez concluded that "Jose" and Augustine worked for Espino because Espino was the one who originally supplied Alvarez with cocaine and who introduced Alvarez to "Jose" and Augustine.

Johnny Robles testified that he met Espino and Augustine in late 1986 while working at a Milwaukee, Wisconsin meat packing plant. Robles knew that Espino and Augustine were "affiliated" in the drug business, and he became involved with them in the sale of cocaine. (Tr. 637). Robles initially received the cocaine from Augustine even though he knew that Espino was the source of the cocaine. From late 1986 until mid–1987, Robles received from Augustine and Espino two to four ounces of cocaine twice a month for a total of approximately twenty deals. Most of Robles' deals were with Augustine, although he contacted "Jose" or Espino if he could not reach Augustine. Robles usually paid Augustine or "Jose" for the cocaine but sometimes he would pay Espino directly. In 1987, Robles temporarily quit the drug-trafficking business because he was worried about getting caught and because he was having difficulty paying his drug debts. Prior to his respite from the drug business, Robles introduced Lafayette Grady, his most reliable customer, to Augustine. Robles testified that Augustine and Espino wanted Grady as a customer.

Lafayette Grady testified that he was a cocaine customer of Robles beginning in 1986. Grady met Espino through Robles who told Grady that if he still wanted to deal in cocaine, he could do so through Espino. Grady had previously heard Robles speak of Espino as the source of his cocaine. At Grady's first meeting with Espino, Augustine was also present. Espino gave Grady a telephone number to use when he wanted cocaine. Grady arranged with Espino to purchase three to four ounces of cocaine. From late 1987 until the end of 1988, Grady engaged in three to four cocaine transactions with Espino, who usually met him at a park in Milwaukee. On one occasion Augustine accompanied Espino during the delivery. Grady testified that when he could not reach Espino at home, Augustine would answer Espino's telephone and deliver the cocaine. Grady estimated that on four or five occasions he obtained cocaine from Augustine because Espino was unavailable.

By the spring of 1990, Robles had returned to the drug trafficking business. Between March 1990 and August 1990, Robles sold cocaine and marijuana, primarily to Anthony Glapa. Robles again used Espino as his source for the cocaine and marijuana. This time, however, "Jose" and Augustine were no longer involved. Robles testified that they were "apparently on their own." (Tr. 650). Robles concluded that Oscar Sandoval was working with Espino because Sandoval was

frequently around Espino, and because Sandoval once delivered fifty pounds of marijuana to Robles at Espino's direction.

Robles testified that he received marijuana from Espino in quantities ranging from ten to fifty pounds. Glapa testified that he observed Robles pick up the marijuana from Espino. Robles paid Espino directly for the marijuana. Robles and Glapa both testified that Robles also received from Espino quarter, half, and whole kilograms of cocaine which Robles conveyed to Glapa. Robles estimated that from late 1990 until May 1991, he engaged in at least five cocaine and five marijuana deals with Espino. Robles regularly owed Espino money for prior deals, receiving the cocaine and marijuana up front. Robles recalled contacting Espino at phone numbers given to him by Espino for the Indios Tavern, two residences, and a beeper.

Robles recalled that in late 1990, he transferred a 1984 Corvette to Espino for $6,000 in cash and six pounds of marijuana. Espino titled the car in co-defendant Santos' name because "[Espino] couldn't show for it more or less what he paid for it or how he paid for it." (Tr. 661–62). Robles and Glapa both testified that in March 1991, they transferred Glapa's 1988 Corvette to Espino in exchange for a seventeen-pound marijuana debt. Espino also titled this car in Santos' name. Santos admitted that, at Espino's request, he titled both vehicles in his name.

On March 5, 1992, pursuant to an investigation of drug trafficking in the community, agents from the Drug Enforcement Agency contacted Espino and received his consent to search his apartment. In the course of the search, the agents found over $19,000 in cash, approximately $16,000 of which was found in the freezer; a nine-millimeter pistol lying on a table; two loaded magazines next to the pistol; a beeper; and assorted personal papers.

Espino took the stand and testified in his own defense. On direct examination Espino denied knowing Grady, and denied transacting drug deals with either Glapa or Alvarez. Espino claimed that the cash, the gun, and the beeper found in his apartment were part of his tavern business. Espino admitted that he obtained twelve pounds of marijuana for Robles on one occasion during the spring of 1991 in exchange for a 1988 Corvette. Espino also admitted that he obtained a second car, a 1984 Corvette, from Robles but denied that the deal involved drugs. Espino acknowledged that he titled both cars in Santos' name, explaining that he did so to hide those assets from his wife during divorce proceedings.

On cross-examination, Espino again admitted to selling twelve pounds of marijuana to Robles. Espino initially claimed that this was the only drug transaction in which he was involved. On further questioning, Espino conceded that in the spring of 1991 he transacted two other deals with Robles that involved a total of three-quarters of a kilogram of cocaine as well as marijuana. Espino testified that his source for the drugs was a man named Ruben who came from Waukegan, Illinois. Espino asserted that his co-defendant, Santos, was not involved in any drug trafficking or money laundering.

On December 21, 1992, the jury found Espino guilty on all four counts of the superseding indictment. On November 12, 1993, the district court sentenced Espino to 211 months' imprisonment on Counts I through III and 60 months' imprisonment on Count IV, all sentences to run concurrently, followed by five years of supervised release, and imposed a $5,000 fine. Espino appeals.[2]

## II.

### A. Admissibility of Espino's Opinion Testimony

■ Rule 701 of the Federal Rules of Evidence provides:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of

---

**2.** This court affirmed the conviction of co-defendant Santos in *United States v. Santos,* 20 F.3d 280 (7th Cir.1994).

the witness' testimony or the determination of a fact in issue.

Fed.R.Evid. 701. In addition, Rule 704(a) provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed.R.Evid. 704(a). The decision to admit lay opinion testimony under Rule 701 is committed to the district court's discretion and is reversed only for an abuse of that discretion. *United States v. Stormer,* 938 F.2d 759, 761 (7th Cir.1991) (quoting *United States v. Towns,* 913 F.2d 434, 445 (7th Cir.1990)).

■ On cross-examination Espino testified as follows:

Q. Okay. But you did deals with Robles involving cocaine and marijuana?

A. That's right.

Q. You had a continuing relationship with Mr. Robles where you supplied him with drugs in the spring of 1991?

A. That was three times that I gave him drugs.

Q. So that's a continuing relationship; correct?

A. Well, after that he disappeared and I never knew what happened to him.

Q. Okay. But it was more than one deal; right?

A. I am telling you very clearly that it was three times.

Q. *Essentially what you're doing here today, Mr. Robles, is you're admitting the conspiracy; aren't you?*

A. First of all, I'm not Mr. Robles.

Q. Mr. Espino.

A. Well, if—

MS. BOWE: I object to this question and answer. It's a legal conclusion and I object to any questions continuing to call for legal conclusions. It's beyond the scope of this witness.

THE COURT: That's—

MR. LIPSCOMB: It goes to his motive for testifying right now, Judge.

THE COURT: The objection is overruled. The witness is instructed to answer the question as best he can.

A. *Well, if you call three times a conspiracy, fine.*

(Tr. 1172–73) (emphasis added). Espino argues that the district court abused its discretion by requiring him to answer whether he was "admitting the conspiracy" because the question demanded a legal conclusion and created the danger that the jury gave his response undue weight.

■ Our decision in *United States v. Baskes,* 649 F.2d 471 (7th Cir.1980), *cert. denied,* 450 U.S. 1000, 101 S.Ct. 1706, 68 L.Ed.2d 201 (1981), supports Espino's position, and we believe the reasons articulated there proscribe the admission of his testimony under Rule 701. In *Baskes,* we held that the district court acted within its discretion in prohibiting cross-examination of a key prosecution witness as to whether he "unlawfully, knowingly and wilfully conspire[d]" with the defendant and others to defraud the United States. 649 F.2d at 478. We reasoned that this questioning contained legal terms of art and called for improper opinion testimony by a non-expert witness:

When, as here, a witness is asked whether the conduct in issue was "unlawful" or "wilful" or whether the defendants "conspired," terms that demand an understanding of the nature and scope of the criminal law, the trial court may properly conclude that any response would not be helpful to the trier of fact. The witness, unfamiliar with the contours of the criminal law, may feel that the legal standard is either higher or lower than it really is. If either event is true the jury may accord too much weight to such a legal conclusion.

*Id.* Similarly, the question posed to Espino, "[Y]ou're admitting the conspiracy, aren't you," required a conclusion regarding the legal implications of his conduct. Espino's lay answer to this question was therefore objectionable as being unhelpful opinion testimony and should have been excluded. A more appropriately phrased question, such as whether Espino had an "agreement" with Robles to supply cocaine, could have avoided the problem of compelling the defendant to offer testimony requiring a legal conclusion. *See Baskes,* 649 F.2d at 478 n. 5 (citing *United States v. Standard Oil Co.,* 316 F.2d

884 (7th Cir.1963)). The district court thus erred in allowing the testimony under Rule 701. Nevertheless, in light of the other, compelling evidence against Espino, which consisted of the interlocking testimony of the four cooperating witnesses, the documentary and physical evidence, as well as his own admissions, the error was harmless. Fed. R.Crim.P. 52; *see, e.g., United States v. Dominguez*, 992 F.2d 678, 681 (7th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 250, 126 L.Ed.2d 203 (1993).

*United States v. Castro*, 788 F.2d 1240 (7th Cir.1986), on which the government relies, is not inconsistent with *Baskes*. The district court there refused to allow the defendant to answer the following questions at the beginning of the direct examination: "Ms. Castro, have you ever conspired or agreed with your husband or anybody to sell or possess drugs?", and "Did you during that period of time agree with anybody to sell or possess drugs?". 788 F.2d at 1249. We held that the defendant should have been allowed to answer these questions:

> In her argument before this court, appellant claims that the trial judge sustained the government's objection on the ground that the question sought an answer to the ultimate issue of the case. It is not clear from the record that this was the basis of the trial court's ruling. If it was the basis of the court's ruling, we cannot agree. We believe that the defendant should have been allowed to answer the questions. Fed.R.Evid. 704 clearly permits testimony on the ultimate issue whenever it would be helpful to the jury. Except in the most unusual circumstances, we do not believe that the defendant ought to be deprived of the opportunity to deny explicitly the elements of the offense charged.

*Id.* We went on to conclude, however, that it was not reversible error to prevent the defendant from answering the questions because her attorney was able to elicit her detailed testimony on all the allegations in the indictment. *Id.* In contrast, the prosecutor's question here did not present Espino with the opportunity to deny the elements of the charged conspiracy. Rather, it sought to elicit his opinion on whether he "conspired" with Robles, and therefore was objectionable under *Baskes*.

■ To the extent Espino argues that the district court should have given buyer-seller and limiting instructions, the record does not indicate that he requested either one, so any objection is waived.[3] *United States v. Olano*, —— U.S. ——, —— – ——, 113 S.Ct. 1770, 1776–77, 123 L.Ed.2d 508 (1993); *United States v. Lakich*, 23 F.3d 1203, 1207–09 (7th Cir.1994). Even in the absence of a waiver, the defendant has failed either to explain the efficacy of a limiting instruction or to justify a buyer-seller instruction.

### B. Propriety of Conspiracy Instruction

■ When charging the jury on Count I of the indictment, the district court followed our pattern instruction § 5.11, and stated that "[i]n determining whether the alleged conspiracy existed, and whether a particular defendant became a member of the conspiracy, you may consider the actions and statements of all the alleged participants. The agreement may be inferred from all the circumstances and the conduct of all the alleged participants." The instruction further stated that "[i]n determining whether a particular defendant became a member of the conspiracy you may consider only the acts and statements of that particular defendant." Espino argues that this instruction was erroneous because the district court failed to instruct the jury that they were not to consider the testimony of Lafayette Grady, Anthony Glapa, and Senovio Rodriguez, which pointed to Espino as the source of the cocaine, in deciding whether Espino joined the conspiracy. Because Espino did not object to the jury instruction at trial pursuant to Fed.

---

**3.** For this same reason, the defendant has waived his argument that the prosecutor's closing statement contained an inaccurate and misleading analogy, "comparing a conspiracy to two people agreeing to go to the store and buy milk." (Tr. 1206). Waiver aside, the court explicitly instructed the jury to base its decision on the

R.Crim.P. 30,[4] he has waived the argument,[5] and the plain error rule does not apply. *Lakich,* 23 F.3d at 1207–08.

■ Even if the court were to apply a plain error analysis, Espino would not be entitled to relief. In *United States v. Martinez de Ortiz,* 907 F.2d 629 (7th Cir.1990) (en banc), *cert. denied,* 498 U.S. 1029, 111 S.Ct. 684, 112 L.Ed.2d 676 (1991), we ruled that this circuit's pattern instruction § 5.11 was misleading because, in light of Fed. R.Evid. 104 and *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), the jury was allowed to consider declarations of co-conspirators against the defendant. 907 F.2d at 633–34. While the jury instruction in this case misstated the law, it worked to Espino's advantage by preventing the jury from considering incriminating evidence of his participation in the conspiracy. *Martinez de Ortiz,* 907 F.2d at 635; *United States v. Brown,* 940 F.2d 1090, 1094 (7th Cir.1991). In addition, the district court's instructions requiring that Espino "wilfully participate" in the conspiracy, that the jury give "separate consideration to each defendant," and that the jury consider the witnesses' testimony "with caution and great care," indicated to the jurors that they should focus on whether Espino's acts and words established his involvement in the conspiracy. *United States v. Goines,* 988 F.2d 750, 773 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 241, 126 L.Ed.2d 195 (1993). Conse-

quently, no plain error resulted from the use of this instruction.[6]

### III.

We conclude that the admission of Espino's opinion testimony was harmless error. We also conclude that the objections to the conspiracy instruction and the prosecutor's closing argument were waived. Accordingly, we affirm the judgment of the district court entered pursuant to the jury's verdict.

AFFIRMED.

---

evidence alone, and not on the lawyers' opening and closing statements.

**4.** Rule 30 provides in part: "No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection." Fed. R.Crim.P. 30.

**5.** A review of the trial transcript reveals that counsel for the defendant knowingly approved of the conspiracy instruction. *United States v. Lakich,* 23 F.3d 1203, 1207–08 (7th Cir.1994). Counsel received a draft of the district court's instructions on the fourth day of the trial and had overnight to consider them. The following afternoon, the court elicited responses from defense counsel regarding the instructions. Counsel for the defendant made no comment about the conspiracy instruction at that time. Once the

instructions were given and the jury began its deliberations, the court received a note from one of the jurors asking, "Does count one address the conspiracy in total or is it a broken-out count just related to the possession with intent to distribute in excess ... controlled substances?". The court, after conferring with defense counsel, responded to the question by drawing the jury's attention to the conspiracy instruction it gave, and by reminding the jury that the elements for the conspiracy charged in Count One were different from the elements for the conspiracy charged in Count Six. Counsel for the defendant agreed to this response, stating that the language of the conspiracy instruction was "acceptable." (Tr. 1296).

**6.** Perhaps it bears reemphasizing that "[d]istrict courts could avoid the need for this line of review by carefully instructing juries on this confusing but important issue, guided by the analysis in *de Ortiz.*" *Goines,* 988 F.2d at 773.