**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Otto JONES and Ann Jones,
Defendants–Appellants.**

Nos. 93–1664, 93–1672.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 19, 1995.

Decided Dec. 29, 1995.

Rehearing with Suggestion for Rehearing
In Banc Denied Jan. 29, 1996.

Barry Rand Elden, Chief of Appeals, Robert Kent (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for the U.S.

William A. Barnett, Jr. (argued), Chicago, IL, Thomas A. Durkin, Michigan City, IN, Daniel S. Alexander, Arnold & Alexander, Chicago, IL, for Otto Jones.

John E. Horn (argued), Tinley Park, IL, for Ann Jones.

Before RIPPLE, MANION, and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

A jury convicted Ann Jones and her husband Otto Jones on counterfeiting charges. They both appeal their convictions, contesting the denial of a motion to suppress evidence of genuine currency found on Mr. Jones at the time of his arrest and two of the district court's evidentiary rulings.[1] We affirm.

## I.

While investigating the circulation of counterfeit currency in Chicago, Special Agent Keith Larson of the Secret Service learned from a confidential informant (Informant One) on June 19, 1989 that counterfeit bills could be obtained from Doris Duncan. On the same day, another confidential informant introduced Special Agent Mark Waterford (working undercover) to Roger "Bobo" Hunter, who told Waterford that he could make counterfeit currency with an office copy machine. For the moment, agents did not pursue the lead on Duncan and instead focused their attention on Hunter.

On the following day, June 20, Waterford met with Hunter and another individual, Kenny Jackson. The three men proceeded to visit various stores procuring bond paper, a photocopier toner cartridge, ink, and a stamper for use in producing counterfeit. Waterford provided the money to purchase these items; he also supplied genuine $20, $10, and $5 dollar bills to use as the originals in the copying process. When Hunter had the materials he needed, he directed Waterford to drop him off in the vicinity of 55th Street and Ashland and wait with Jackson while he copied the currency at his girlfriend's house; Hunter then departed on foot in the direction of Paulina Street carrying a dark brown leather briefcase and the supplies the men had purchased that day. Jackson, concerned about police surveillance, directed Waterford to drive him to 2200 South Princeton (where Hunter had an apartment) in order to obtain a paper cutter. After speaking with Hunter by telephone and confirming that Hunter had completed the copying, Jackson parted company with Waterford at that address, telling him that Hunter would come by in a taxi to deliver the counterfeit currency. Waterford waited there for a few moments; but after concluding that Jackson and Hunter had been frightened by police surveillance, Waterford decided to leave the Princeton address without ever receiving the counterfeit bills.

On the morning of June 29, 1989, Special Agent Larson and Special Agent Todd Matanich met at a convenience store near the Museum of Science and Industry with Informant One, who once again told the agents that Doris Duncan could obtain counterfeit currency. The agents gave him $100 so that Duncan might do so. The serial numbers of the bills given to the informant were recorded. Informant One then drove off with Duncan in a silver Buick. Agents followed the car to the vicinity of 54th Street and Paulina.

1. Although separately represented, Ann Jones has simply adopted the arguments Otto Jones has made on appeal.

At about the same time that Larson and Matanich were meeting with the informant, Waterford and Special Agent Dennis Doyle were parked in a van on the 5400 block of South Paulina conducting surveillance.[2] At 11:32 a.m., they observed a silver Buick pull into an alley located two houses south of 5440 South Paulina; shortly thereafter, they saw Duncan emerge from the alley and walk up to the entrance of Number 5440. When Ann Jones answered the door, the agents saw Duncan take what appeared to be currency from her purse and hand it to Ms. Jones, who closed the door. Minutes later, Duncan approached a window at the front of the house and then walked away toward the alley, counting something in her hands. Informant One subsequently met with Matanich at the convenience store and provided Matanich with three counterfeit $100 bills. Matanich immediately left to obtain a search warrant for the premises at 5440 South Paulina.

Meanwhile, Agents Waterford and Doyle continued their surveillance of 5440 South Paulina. Throughout the day, they witnessed numerous comings and goings at that address, including the following:[3]

* At 12:18 p.m., a man walked to the front of the house and rang the doorbell. Ann Jones answered the door and handed currency to him. He then walked to another residence north of Number 5440 and handed the currency to other individuals.

* At 12:40 p.m., Keisha Williamson, the daughter of Ann and Otto Jones, arrived on a motor scooter with an unidentified male. Williamson let herself into the house for a few moments. When she emerged, she handed folded currency to the motorcycle driver, who put the currency in his pocket and drove away. Williamson then reentered the house.

* At 2:32 p.m., Ann Jones, whom the agents had not observed leave the house, drove up and parked in front of the residence, and then walked into the house carrying grocery bags.

* At 4:34 p.m., two men arrived in a blue Chevrolet that they parked in front of the house. The driver exited the car, approached the house, rang the doorbell, and was admitted by Mrs. Jones. A short time later he left the house and returned to the car. Moments later, Mrs. Jones came out of the house, walked over to the car, removed currency from her shorts and handed it to the driver.

* At 5:12 p.m., Mrs. Jones left the house, got into a car, and drove away. When she returned forty-five minutes later, a black Thunderbird drove up and parked as she was walking up to the house. The driver of the Thunderbird left his car and spoke with Mrs. Jones on the front porch; he then walked into the house with her. The driver of the Thunderbird left the house a moment later carrying currency.

At about 6:15 p.m., Special Agents Larson and Matanich met with Informant One and gave him another $100 with which to purchase counterfeit currency. Shortly thereafter, Duncan picked him up and drove to the vicinity of 54th and Paulina. At 7:07 p.m., Waterford observed Duncan approach 5440 South Paulina and ring the doorbell. Mrs. Jones answered the door and admitted Duncan into the residence. Minutes later, Duncan emerged from the house with a paperback book in hand. Informant One met with Larson and Matanich later that evening and delivered three counterfeit $100 bills.

At about 7:15 p.m., approximately seven Secret Service agents and two Chicago police officers executed a search warrant that had been obtained for the premises of 5440 South Paulina. Mrs. Jones answered Agent Matanich's knock on the front door and admitted the officers to the home. Mr. Jones was standing just inside the doorway, dressed in pajamas and a bathrobe. As the officers entered, Mrs. Jones dropped an apparently genuine $20 bill as she attempted to stuff papers into her pants. When she was

---

**2.** The agents had acquired information from two informants that the house located at 5440 South Paulina was a source of counterfeit currency.

**3.** At least one other visitor was noted calling on the residence that afternoon, but the surveillance agents did not observe anything change hands.

searched, agents discovered an envelope in the waistband of her pants containing some $6,000 worth of counterfeit bills in denominations of $100, $50, and $20. Ultimately, Mr. Jones was searched as well.[4] Genuine currency in the amount of $299 was discovered in the pocket of his bathrobe.

A search of the premises revealed counterfeit currency and the materials required to make it throughout the house. In the first floor master bedroom presumably shared by Ann and Otto Jones (more on that below), Matanich found the following items:

(1) On the bedroom floor, a Sharp Z–50 photocopier with its paper tray and cartridge attached. (Boxes corresponding to the copier and its cartridge were found by Special Agent Eric Truitt in a storage area at the rear of the house.) Gerald Cole, a Secret Service document analyst, would later testify that all of the counterfeit currency at issue in this case was produced by a black and white office photocopier.

(2) Beneath the mattress, three "mockups" each consisting of three genuine $100, $50, or $20 bills with their serial numbers obliterated, taped to a sheet of paper for copying. Cole would testify that all of the $50 counterfeit bills recovered by the agents were produced using the $50 mock-up found beneath the mattress. However, none of the $20 or $100 counterfeit bills recovered were produced using the particular $20 or $100 mockups discovered in the bedroom.

(3) On a nightstand next to the bed, several colored pencils, an eraser, and a pencil box. According to Cole, the green pencil among those found in the bedroom was of the same type used to color the Treasury seals on each of the counterfeit bills recovered in this case.

(4) On the floor next to the copier, a brown briefcase containing paper and paper wrappers.

(5) On the floor underneath the bed, a stack of paper. The paper found here and in the briefcase bore the watermarks "Gilbert Writing 25 percent cotton" and "Circa 83." The counterfeit currency attributed to the Jones bore both watermarks. Genuine currency bears no watermarks.

In the Jones' kitchen, Matanich located additional sheets of paper that bore the Gilbert watermark and (with the exception of some paper found on the kitchen table) the Circa 83 watermark as well. In the rear stairway of the house, Matanich discovered a sewing kit containing counterfeit $10 bills without serial numbers and, on a windowsill behind a shoe box top, an ink pad and a stamper. That stamper was of the same type used to stamp serial numbers onto the counterfeit currency, and in fact it was set to reproduce the same serial number found on all of the stamped counterfeit currency in the house. Finally, on top of a television control box in the basement, Special Agent Doyle discovered a counterfeit $100 bill.

Both Otto and Ann Jones were arrested before the search of the house was completed; two years later they were indicted.[5] Count One of the indictment alleged that the Jones had conspired throughout June 1989 to make and possess counterfeit U.S. federal reserve notes, in violation of 18 U.S.C. § 371. Count Two alleged that in or about June 1989, the defendants had made counterfeit $100, $50, and $20 federal reserve notes bearing the same serial number with the intent to defraud, in violation of 18 U.S.C. §§ 2 and 471. Count Three asserted that on or about June 29, 1989, the Jones had possessed, again with the intent to defraud, counterfeit $100, $50, and $20 federal reserve notes all bearing the same serial number, in violation of 18 U.S.C. §§ 2 and 472.

In advance of trial, Otto Jones sought to suppress evidence of the statements he made following his arrest, as well as the $299 in genuine currency found in the pocket of his bathrobe. Mr. Jones contended that at the time he was arrested and searched, the authorities lacked probable cause for the ar-

---

4. Exactly when Mr. Jones was searched is not clear from the record. This is a matter we take up below in discussing the propriety of the search.

5. Keisha Williamson was also arrested, but apparently was never charged.

rest. In response, the government argued that even if probable cause to arrest Mr. Jones was absent at the particular point in time that he was arrested and searched, the genuine currency in his bathrobe would have been discovered inevitably pursuant to an appropriate search at a later time, given that by the time the search of the Jones residence was completed, the authorities did have probable cause to arrest Mr. Jones. The district court agreed. Setting aside any evidence obtained from Mr. Jones' person or statements that he made, it was clear to the court that by the time the search of the house was completed, the officers had reasonable grounds to believe that counterfeiting was taking place in the home and that Otto Jones was involved. Consequently, the agents ultimately would have had probable cause to arrest him before they departed, rendering discovery of the $299 found in the pocket of his bathrobe inevitable. Similarly, because the authorities had probable cause to arrest Mr. Jones before they left the home, any statements that Mr. Jones later made at the Chicago field office of the Secret Service pursuant to routine post-arrest questioning were not tainted by the possibility that the actual arrest may have been made prematurely.

The government's case against the defendants included, in addition to the physical evidence and the agents' observations described above, the testimony of two fingerprint experts. Leonard Dreibelbis testified that Ann Jones' fingerprints were found on the photocopier paper tray taken from the master bedroom as well as the $20 and $100 mockup sheets found underneath the mattress. Otto Jones' prints were discovered on the same photocopier tray, five of the $100 bills his wife had attempted to stash in her waistband, and on one of the counterfeit $10 bills found in the box taken from the back stairwell of the house.[6] Patricia Cushing testified that she detected Mr. Jones' thumbprint on a paper wrapper within the briefcase found on the floor of the master bedroom.

The government was also permitted, over the defendants' objection, to offer testimony establishing that the defendants apparently had no legitimate income in the months prior to their arrest, thus suggesting that the $299 found in Mr. Jones' pocket likely was derived from counterfeiting. Witnesses from the Inspector General's Office of the U.S. Department of Health and Human Services and the Illinois Department of Public Aid testified that Mr. Jones had not reported any income to either the Internal Revenue Service or the Social Security Administration since 1966; that although Mr. Jones had not received any SSA benefits as of June 1989, he had applied for disability benefits in November 1989 reporting that he had not worked since 1966 and had been disabled by substance abuse and swollen feet since 1986; that Mrs. Jones had two social security numbers, one of which had no reported income associated with it after 1980 and the other showing some income for 1989 but all of it *after* June 29, 1989; that Mr. Jones had not received any public aid from Illinois prior to September 1989; and that from March until the end of June, 1989, Mrs. Jones had received less than $250 in public aid benefits and food stamps.

The defense theory of the case rested on the premise that the counterfeit bills and the equipment used to make them belonged not to the Jones, but to Roger Hunter. Hunter, of course, was the individual who led Agent Waterford about the city on June 20 collecting supplies to produce counterfeit currency but in the end never appeared to deliver the fake bills to Waterford. Hunter's two children and their mother lived just down the block from Otto and Ann Jones. Ann Jones testified that on June 20 (the same day that Hunter had gathered supplies to manufacture counterfeit currency for Agent Waterford), Hunter had appeared on her doorstep explaining that his car had broken down in the midst of moving and asking whether he could leave some items in the safekeeping of the Jones. Mrs. Jones said she agreed and accepted two boxes from Hunter, which he led her to believe contained clothes and a

---

**6.** Dreibelbis also reported finding no prints belonging to Bobo Hunter (to whom the defense alleged the counterfeit currency and copying ma- terials belonged, as we discuss below) on any of the items he examined.

VCR. (Otto's brother, Johnnie Jones, who lived in the flat above Otto and Ann Jones, confirmed that he saw Hunter deliver two boxes to the house at about that time.) A few days later, Mrs. Jones looked through the contents of the boxes and found the photocopier, a briefcase containing stacks of paper,[7] a Crown Royal bag containing a stamper and stamp pad, a sewing kit containing counterfeit bills in denominations of $10 and $20, and, amongst some clothing, a jacket with additional counterfeit bills in a pocket. Mrs. Jones decided to bring the copier, briefcase, and the phony currency into the house, leaving the stamper and the other items in the stairwell with the household trash. (It would seem that Hunter and the Jones were not the best of friends.) Mrs. Jones showed the counterfeit currency to her husband, who inspected it and told her to get rid of it. However, she left it instead in one of Hunter's boxes in the back stairwell, purportedly without her husband's knowledge. A few days later, she discovered the currency mockups. When she mentioned them to her husband, Mr. Jones told her to keep the attached currency because it was genuine. Instead, she stuck the mockups underneath her mattress, intending to return them to Hunter. On that same day, she noticed Mr. Jones, who had decided to pawn the copy machine, trying the apparatus out to see if it worked. As far as she was aware, however, Otto Jones had never used the copier to produce counterfeit currency.

Mrs. Jones acknowledged selling some of the counterfeit bills she had discovered, but to one person only—Doris Duncan. Jones had mentioned to Duncan the fake currency she had found one day while they were both purchasing heroin. Late in the morning of June 29 (the same day Agents Waterford and Doyle were watching the Jones residence), Duncan stopped by and Jones gave her several counterfeit bills in exchange for $20, which she later spent on groceries. Duncan returned to the house that evening and, in exchange for heroin, Jones gave her some more of the counterfeit currency. Mrs. Jones said that her husband, who spent the majority of that day in the basement trying to sleep, was unaware of her transactions with Duncan. The money found in Otto Jones' pocket, Mrs. Jones claimed, was money he had earned as a street vendor of t-shirts, caps, gloves, headbands, and other items. And although she acknowledged that several other people stopped by the house that day, she denied providing counterfeit bills to anyone other than Duncan.

On cross-examination, Mrs. Jones acknowledged that both she and her husband were addicted to heroin and required more than $100 per week to support their habits. She also acknowledged that she had last worked in 1988, that from March through the end of June, 1989, she had received little public aid, and that Mr. Jones did not begin to receive disability benefits until after they were both arrested. Finally, Mrs. Jones admitted that she had lied on multiple occasions in order to receive welfare benefits between 1987 and 1991.

Trial commenced in December 1991 and on January 3, 1992 a jury convicted Mr. and Mrs. Jones on Counts One and Three (the conspiracy and possession charges) but acquitted them on Count Two (the manufacturing charge). On March 11, 1993, the district court ordered both defendants to serve thirty months in prison and to make restitution to the Secret Service in the amount of $135.

## II.

A. Inevitable Discovery of the Currency in Mr. Jones' Pocket

█ As we have noted, Otto Jones sought unsuccessfully in advance of trial to suppress all evidence concerning the statements he made following his arrest and the $299 in genuine currency found in the pocket of his bathrobe. No use was made at trial of any post-arrest statement Mr. Jones made to the arresting agents; at this juncture, consequently, only the admission of the cash found on his person is material. We review the district court's decision to deny Mr. Jones'

---

7. Agent Waterford testified at trial that he recognized the briefcase as the one he had seen Hunter carrying on June 20.

motion to suppress that evidence for clear error. *E.g., United States v. Willis,* 61 F.3d 526, 529 (7th Cir.1995), *pet. for cert. filed* (Oct. 23, 1995) (No. 95–6488); *United States v. Saadeh,* 61 F.3d 510, 516 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 521, 133 L.Ed.2d 428 (1995).

Before we embark on an analysis of the relevant legal precedents and the facts, we need to make several points clear. First, we note that the record does not make clear precisely when Mr. Jones was searched. Below, Mr. Jones asserted that he was both arrested and searched (presumably incident to the arrest) within a short time after the authorities were admitted to the house (R. 38 at 1–2, 4; R. 44 at 1, 4); on appeal, however, he argues that the pat-down search took place at some point prior to his arrest (Opening Br. at 10). We shall assume consistent with Mr. Jones' position on appeal and with the government's understanding of the chronology of events (*see* Gov.Br. at 32 n. 9), that Mr. Jones was patted down prior to his arrest. Second, although we do not know just when either the arrest or the pat-down of Mr. Jones which yielded the $299 took place, the government does not argue that the authorities had probable cause to arrest Mr. Jones at the moment he was searched (thus justifying the search as one incident to arrest), nor do they offer any other basis for the pat-down. Thus, we shall assume, consistent with Mr. Jones' argument, that the authorities exceeded the bounds of the Fourth Amendment when they searched Mr. Jones' person at the moment they did. The only basis on which the government defends the admission of the currency found in the pocket of Mr. Jones' bathrobe, and the only basis on which the district court allowed it, is the doctrine of inevitable discovery. In essence, the government maintains that despite the lack of probable cause to arrest Mr. Jones and to search him when the pat-down was conducted, the authorities would ultimately have had probable cause for the arrest and search before leaving the premises

of the Jones household, rendering discovery of the $299 in his pocket inevitable.

In striking a balance between society's interest in deterring police misconduct and its comparable concern that juries not be deprived of probative evidence, the Supreme Court has concluded that when the authorities have seized evidence in violation of statutory or constitutional protections, they should be placed in no better, but no worse, a position than they would have been had no impropriety occurred. *See Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377 (1984). The inevitable discovery doctrine exemplifies that balance. Whereas the exclusionary rule deprives the prosecution of evidence tainted by official wrongdoing and thereby discourages future improprieties, the inevitable discovery exception to the rule permits the introduction of evidence that eventually would have been located had there been no error, for in that instance "there is no nexus sufficient to provide a taint." *Id.* at 448, 104 S.Ct. at 2511. Thus:

> If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense.

*Id.* at 444, 104 S.Ct. at 2509 (footnote omitted). The government's invocation of this doctrine calls upon the court to decide whether the government ultimately and legitimately would have discovered the money in the pocket of Mr. Jones' bathrobe had he not been patted down prematurely, in violation of his Fourth Amendment rights. All parties appear to agree that if the agents searching the Jones household otherwise would have had probable cause to arrest Otto Jones by the time they departed the premises, they in fact would have arrested him, patted him down at that time, and located the money in his pocket.[8] We therefore consider the ques-

---

8. As we recently emphasized, whether authorities would in fact have conducted a lawful search is a question distinct from whether they would have had probable cause to do so; that is, probable cause to search does not alone render discov-

ery of the evidence in question inevitable. *United States v. Brown,* 64 F.3d 1083, 1085 (7th Cir.1995) (distinguishing *United States v. Buchanan,* 910 F.2d 1571 (7th Cir.1990)). Here, however, as in *Buchanan,* the defendants have

tion whether the agents did, before they left the premises, have probable cause to arrest Mr. Jones based on the other evidence they lawfully observed in the Jones' home.[9]

■ "Police officers have probable cause to make an arrest where 'the facts and circumstances within their knowledge and of which they [have] reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *United States v. Levy*, 990 F.2d 971, 973 (7th Cir.1993) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)); *see also Wong Sun v. United States*, 371 U.S. 471, 479, 83 S.Ct. 407, 413, 9 L.Ed.2d 441 (1963). There are, of course, no bright lines that circumscribe the realm of probable cause. *See Jones v. Webb*, 45 F.3d 178, 181–82 (7th Cir.1995).

> The rule of probable cause has been described as a "practical, nontechnical conception" that accommodates the often competing interests of effective law enforcement and the privacy and liberty of law-abiding citizens. *See Brinegar [v. United States ]*, 338 U.S. [160] at 176, 69 S.Ct. [1302] at 1311 [93 L.Ed. 1879] [ (1949) ]. The on-the-spot determination often requires an "exercise of judgment, which 'turn[s] on the assessment of probabilities in particular factual contexts—not readily or even usefully reduced to a neat set of legal rules.'" *Maxwell [v. City of Indianapolis ]*, 998 F.2d [431] at 434 [ (7th Cir.1993) ] (citing *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 2329 [76 L.Ed.2d 527] (1983)). In recognition of the endless scenarios confronting police officers in their daily regimen, courts evaluate probable cause "not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person *in the position of the arresting officer*—seeing what he saw, hearing what he heard." *Mahoney v. Kesery*, 976 F.2d 1054, 1057 (7th Cir.1992) (citing *Richardson v. Bonds*, 860 F.2d 1427, 1431 (7th Cir.1988)). In practice, then, it can be said that "[p]robable cause—the area between suspicion and virtual certainty—describes not a point but a zone," *Llaguno v. Mingey*, 763 F.2d 1560, 1565 (7th Cir.1985) (en banc), within which reasonable mistakes will be excused. *See Brinegar*, 338 U.S. at 176, 69 S.Ct. at 1311.

*Sheik–Abdi v. McClellan*, 37 F.3d 1240, 1246 (7th Cir.1994) (emphasis in original), *cert. denied*, —— U.S. ——, 115 S.Ct. 937, 130 L.Ed.2d 882 (1995).

■ We turn to consider the facts as they would have appeared to the agents who arrested Mr. Jones, excluding from the picture, of course, the money discovered in the patdown of his person. Before entering the house, Special Agents Waterford and Doyle had, in the course of their surveillance, witnessed a number of individuals approach and/or enter the house for short periods and leave carrying what appeared to be currency. Indeed, the agents observed Duncan do so on two occasions that day;[10] and in each in-

---

focused their appeal on whether the agents who executed the search of the Jones household would have had probable cause to arrest Mr. Jones before they left the premises. No one disputes that if the officers did have probable cause to arrest him, they would have done so and, pursuant to the arrest, patted him down and discovered the currency on his person.

Had Mr. Jones not been arrested by the time the search was finished and the agents left the premises, it is highly unlikely that the authorities would have returned at a later date to find the $300 still in the pocket of his bathrobe. Consequently, we will restrict our analysis to the evidence and circumstances observed by the agents in the course of their search.

**9.** Of course, the subsequent discovery of Mr. Jones' fingerprints on the copier, several of the counterfeit bills, and the paper wrapper found in the briefcase, provided a key link in the evidence establishing his involvement in the counterfeiting. However, practicalities prevent us from considering this evidence in the inevitable discovery analysis. The fingerprints were not matched to Mr. Jones until quite some time after the search of the house had been completed.

**10.** We recognize, of course, that on the occasion of Duncan's second visit to the house that evening, she left carrying what appeared to be a paperback book rather than currency. But in light of what had transpired throughout the day, and in particular the agents' prior success in obtaining counterfeit currency through Duncan and Informant One, one might reasonably have suspected that the paperback book was a convenient means of hiding the currency. Indeed,

stance they sighted Duncan a short time after Special Agents Larson and Matanich had given Informant One money to acquire counterfeit currency through Duncan and a short time before the informant returned to Special Agents Larson and Matanich with counterfeit bills. Upon entering the house, the agents witnessed Ann Jones attempting to stuff into her pants what on inspection turned out to be an envelope containing thousands of dollars in counterfeit bills. Mr. Jones, notably, was in her immediate presence as she was doing so. The officers subsequently discovered the equipment used to produce the bills scattered throughout the house—the copier, colored pencils, and briefcase with blank paper in the bedroom; the mock-ups of original bills underneath the mattress; the stamper in the rear stairwell; additional blank paper in the kitchen. Counterfeit currency was also discovered in the rear stairwell and on top of the television in the basement. Much of this contraband was in plain view. Indeed, the fact that several of the items were found in the master bedroom that Mr. and Mrs. Jones presumably shared only increases the likelihood that Mr. Jones was aware of, and had access to, the counterfeiting materials.

With all of these circumstances in mind, we do not believe it clear error for the district court to conclude that the officers would have had probable cause to arrest Mr. Jones before they left the premises irrespective of the money found in the pocket of his bathrobe. It is undisputed that Mr. Jones lived on the premises, as his state of attire at the time of the arrest tends to confirm. Indeed, given that he had not been observed either leaving or returning to the premises in the course of the surveillance, so far as the officers knew he had been on the premises throughout the day. And during that time, numerous people had visited the house with the apparent purpose of obtaining counterfeit money, in a number of cases ringing the doorbell to announce their arrival and in some instances being admitted inside the house. Given the fairly extensive amount of trafficking in counterfeit money Ann Jones

had apparently conducted on the premises on that day alone, the evidence of counterfeiting scattered throughout the basement and first floor of the home, the officers conducting the search reasonably could have concluded that Mr. Jones, as a resident of the premises (indeed, one who was present while Mrs. Jones attempted to hide counterfeit bills on her person) was not only aware of the counterfeiting activity, but played some part in it. *See United States v. Pace,* 898 F.2d 1218, 1240 (7th Cir.) (police had probable cause to arrest defendants after search of condominium, where defendants had been seen emerging from rooms where large amounts of money and cocaine were found), *cert. denied sub nom. Cialoni v. United States,* 497 U.S. 1030, 110 S.Ct. 3286, 111 L.Ed.2d 795 (1990), and *cert. denied sub nom. Savides v. United States,* 498 U.S. 878, 111 S.Ct. 210, 112 L.Ed.2d 170 (1990); *United States v. Jones,* 696 F.2d 479, 486 (7th Cir.1982) (police had probable cause to arrest defendant present in motel room, where room was littered with drug paraphernalia and substances resembling drugs), *cert. denied,* 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983). We recognize that the illegal acts of one individual cannot automatically be attributed to her spouse as well; ultimately, the government must make an independent case for the spouse's culpability. *See United States v. Castro,* 788 F.2d 1240, 1249 (7th Cir.1986). Mr. Jones' "mere propinquity" to Mrs. Jones and the site of her trafficking of counterfeit did not supply the authorities with probable cause to arrest him. *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979). And, until the fingerprint analysis was completed some time after the search, the officers had little information tying Mr. Jones directly to the counterfeiting activity. Nonetheless, we cannot say that no reasonable person could accept the district court's conclusion that the officers' on-the-spot assessment of Mr. Jones' likely involvement lay within the "zone" of probable cause. Given Mr. Jones' evident status as a resident of a private household in which counterfeit

---

Informant One did deliver additional counterfeit currency to the agents shortly after Duncan left the Jones' household.

money was being sold on regular basis and in which the evidence of counterfeiting lay in plain view, one could fairly conclude that the arresting agents had probable cause particularized as to Mr. Jones himself. *See id.* at 91, 100 S.Ct. at 342; *Pace,* 898 F.2d at 1240.[11]

At trial, of course, the defense attempted to show that to whatever extent Ann Jones had trafficked in counterfeit money, Mr. Jones was not aware of her conduct, let alone a participant in it. Thus, for example, Ann Jones testified that Otto had been sleeping in the basement (to avoid noise from the rest of the house) throughout the day prior to the search, and that she had been careful not to attract his attention on the occasions she sold counterfeit bills to Doris Duncan. Certainly there is evidence in the record to support her testimony. Mr. Jones was, after all, dressed in pajamas and a bathrobe when the officers arrived that evening to execute the search warrant. But it is also possible, and not unreasonable, to think that in light of the array of counterfeit money and the materials used to produce it in the house, not to mention the number of people who visited the home that day and left with what appeared to be currency, that Otto Jones was not, in reality, oblivious to what was transpiring. The probable cause determination "does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands, and credibility determinations are seldom crucial in deciding whether the evidence supports a reasonable belief in guilt." *Gerstein v. Pugh,* 420 U.S. 103, 121, 95 S.Ct. 854, 867, 43 L.Ed.2d 54 (1975).

Although he concedes that he shared with Ann the master bedroom where the copier and other items were found, Otto Jones suggests that the arresting officers would not have known that fact (and thus inferred his knowledge of and/or access to the key items of contraband found within) had he not been prematurely arrested and retrieved his clothing from that bedroom. For several reasons, we find his assertion unpersuasive. First, although we do not wish to make categorical assumptions about the sleeping arrangements of married couples, certainly it would not have been unreasonable for the officers on the scene to assume that Ann Jones shared a bedroom with her husband. Certainly Mr. Jones has identified nothing in the record that would have suggested otherwise to the arresting officers. On the contrary, the sole testimony in the record as to this fact suggests that the officers noted two bedrooms in the first floor living area, one of which contained clothing appearing to belong to a younger woman (no doubt Keisha Williamson), and the other—the master bedroom—containing the clothes of an adult male and female.[12] Exactly when the officers made these observations (i.e., before or after they arrested Otto Jones) is not clear; but we think it safe to assume that even had the officers not observed Mr. Jones retrieving clothing from the master bedroom he shared with Mrs. Jones, they would have looked into the closets and noted the presence of male clothing in that room before leaving the premises.

Because it is reasonable to conclude based on the facts of record that the officers executing the search warrant would have attained probable cause to arrest Mr. Jones

---

11. We share Judge Ripple's concern at the prospect of law enforcement personnel arresting as a matter of course individuals who merely were aware of their spouses' criminal activity and had access to the tools of the crime. *Post* at 1337–38. Yet, given the abundant evidence of counterfeiting strewn about the Jones household in plain view, we cannot say that no reasonable police officer confronted with this evidence could have thought Otto Jones complicit in his wife's counterfeit trafficking or, more precisely, that the district court clearly erred in concluding that a reasonable officer might think just that. Each case must be decided on its own facts, of course, and we urge the district courts to be vigilant

when called upon to consider whether there was probable cause to arrest persons circumstantially implicated in their spouses' crimes.

12. The second floor of the house was a separate flat occupied by Otto's brother, Johnnie Jones, and their mother. The basement contained another apartment where, according to Ann Jones, Otto went to rest during the day. Johnnie Jones testified, however, that Mr. Jones spent his nights in the first floor living area.

The Jones have a son who was ten years old at the time his parents were arrested. The record is unclear as to what room in the house he occupied.

before leaving the premises, even had they not patted him down prematurely and discovered the $299 in his pocket, we find no clear error in the district court's determination that discovery of the $299 was inevitable.

■ A cautionary word is in order before we move on. As *Nix* itself makes clear, when the government relies on the inevitable discovery doctrine, it bears the burden of *proving*, by a preponderance of the evidence, that it would have found the challenged evidence through lawful means. 467 U.S. at 444, 104 S.Ct. at 2509. In this case, the district court resolved the motion to suppress on the written memoranda submitted by the parties, without conducting an evidentiary hearing. Moreover, although the government did tender some exhibits in support of its inevitable discovery claim, it proffered no testimony establishing what procedures it would have followed had Mr. Jones not been patted down prematurely and demonstrating why those procedures would have led ultimately to his arrest and the search of his person. For several reasons, we do not find the omission fatal to the district court's inevitable discovery analysis. In this case, a search of the Jones household was already underway when Mr. Jones was patted down improperly, and it is solely that search of the premises and the evidence it produced that the government relies on as the source of probable cause to arrest Mr. Jones. *Cf. Nix,* 467 U.S. at 448–50, 104 S.Ct. at 2511–12 (search was already approaching·location of victim's body when police improperly elicited the location from the defendant himself). Consequently, there is no dispute as to what steps the government might have taken had no impropriety occurred. Instead, the focus of the dispute here is on whether the information that the search of the house yielded was enough to supply probable cause to arrest Mr. Jones. *See* n. 8, *supra.* Furthermore, there is no material dispute as to the facts surrounding the search or as to what the authorities learned from it. Under these circumstances, we do not think the government was compelled to tender additional evidence or that the district court was obliged to conduct a hearing in order to receive it. But we wish to stress that the burden of proof *Nix* imposes on the government ordinarily will require the government to do more than it did in this case. *Nix,* we repeat, speaks in terms of *proof* by preponderance of the *evidence* that the government would have discovered the challenged evidence through lawful means; and typically that will entail testimony rather than mere argument. It is all too easy to imagine in retrospect lawful avenues through which the government might have obtained evidence that in reality it came upon in contravention of the Fourth Amendment. Speculation and assumption do not satisfy the dictates of *Nix,* however. *See United States v. Brown,* 64 F.3d 1083, 1091 (7th Cir.1995) (Rovner, J., dissenting). Inevitable discovery is not an exception to be invoked casually, and if it is to be prevented from swallowing the Fourth Amendment and the exclusionary rule, courts must take care to hold the government to its burden of proof.

**B. Motion to Strike Testimony of Fingerprint Expert**

■ In cross-examining Leonard Dreibelbis, the defense asked the fingerprint specialist to identify the nine points of identity he discerned in comparing the known prints of Otto Jones with prints found on the counterfeit currency found in Ann Jones' waistband and elsewhere in the Jones home. Dreibelbis indicated that he didn't know "exactly what all the points are" (Tr. 360), explaining that he had not prepared a written report of his examination (Tr. 361), that he could not identify any points of similarity in the prints on the witness stand without a magnifying glass (Tr. 371, 377), and that although he had prepared enlarged photographs of the prints which could be used to identify the points of identity, he had not brought them to court on the government's instruction (Tr. 366–67, 371). The defendants moved to strike Dreibelbis' testimony, contending that they were precluded from cross-examining him effectively as to the data underlying his opinion. The district court denied the motion, and Mr. Jones renews his objection on appeal.

We find no merit in the challenge, however. Evidentiary matters are committed to the district court's sound discretion. *United States v. Hubbard,* 61 F.3d 1261, 1272 (7th

Cir.1995). Although we readily agree with Mr. Jones that the defendants were entitled to probe the basis for Dreibelbis' opinion on cross-examination, no undue restriction was imposed on that right here. Neither defendant sought a continuance during which Mr. Dreibelbis might have obtained the magnifying glass or the photographic enlargements he required in order to identify the points of identity in the prints he had examined, and so far as the record reveals, a short continuance would have resolved the situation altogether. We held in *United States v. Bastanipour*, 697 F.2d 170, 176–77 (7th Cir.1982), *cert. denied*, 460 U.S. 1091, 103 S.Ct. 1790, 76 L.Ed.2d 358 (1983), that an expert's failure to retain materials underlying his opinion went to the weight, rather than the admissibility, of his opinion. We reach the same conclusion here. Mr. Jones hints at a malevolent purpose in the government's instruction to Dreibelbis not to bring the photographic enlargements with him to court; but the record does not confirm any wrongdoing. At most, the government's instruction to Dreibelbis (whatever its aim) merely required a delay for purposes of obtaining a magnifying glass or the enlargements he had prepared. In this context, the defendants' decision to forego the continuance and instead highlight on cross-examination the absence of materials that would support Dreibelbis' opinion must be viewed as a tactical decision by the defense. *See Bastanipour*, 697 F.2d at 177; *United States v. Mangan*, 575 F.2d 32, 47–48 (2d Cir.) (Friendly, J.), *cert. denied*, 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1978).

C. Welfare Evidence

■ Mr. Jones also objects to the district court's decision to permit testimony concerning the Jones' public aid history. Mr. Jones, as we have noted, did not receive any public aid prior to his arrest. Mrs. Jones had received such aid, but in amounts totalling less than $300 in the months prior to their arrest. The government's purpose in offering the evidence was to establish the lack of any legitimate source of income that might explain the $299 found in the pocket of Mr. Jones' bathrobe and thus to suggest that it likely represented the illicit proceeds of counterfeiting. Mr. Jones contends that the evidence was highly prejudicial, calculated to stir jury members' prejudice against persons who receive public aid. As this was an evidentiary matter, we review the district court's decision to allow the testimony for abuse of discretion. *Hubbard*, 61 F.3d at 1272.

We observed in *United States v. Velez*, 46 F.3d 688, 692–93 (7th Cir.1995), that the defendant's receipt of public aid was relevant to establish that the financial transactions in which he had engaged, including the purchase of a home, were likely funded by illegally derived money. Similarly here, the government offered evidence that the Jones had *not* recently received significant amounts of public aid as part of an overall effort to establish that the defendants had no apparent legitimate source of income which would explain the cash found in Mr. Jones' pocket. The probative value of such evidence was, we agree with Mr. Jones, somewhat limited. In contrast to *Velez*, the amount of money in question was not large. Three hundred dollars is not an extraordinary sum of money to carry on one's person, and the fact that the Jones were unemployed and not then receiving much public assistance does not rule out a variety of legitimate sources of the cash— Mr. Jones may have won it in a card game, it may have been a loan from a relative, or it may have been, as Mrs. Jones suggested, the proceeds of his work as a street vendor. At the same time, testimony about a defendant's public aid history regrettably may pose a danger that the defendant will be stigmatized in the eyes of the jury.[13]

---

13. Notably, the government did more than simply establish that neither Ann nor Otto Jones was receiving public aid at the time of their arrest; it also elicited testimony to the effect that Ann Jones maintained two social security numbers. To the extent that this information suggested that Mrs. Jones might previously have engaged in fraud, it enlarged the prejudicial aspect of the inquiry into the Jones' public aid history and made the balancing called for under Federal Rule of Evidence 403 somewhat more close. We also note that, in recounting Ann Jones' receipt of payments, a witness from the Illinois Department of Public Aid began to volunteer that Mrs. Jones had been suspended from public aid early in 1989 for failure to cooperate with an employ-

Ultimately, however, we cannot say that it amounted to an abuse of discretion for the district court to permit the testimony in this case. The government's theory was that Mrs. Jones, with her husband's assistance, was selling counterfeit bills from her home, a view of the case borne out by what Special Agents Waterford and Doyle observed in the course of their surveillance, the search of the Jones' home, and the arrest of Mr. and Mrs. Jones. Given the nature of the trafficking with which the Jones were charged, the source of the cash found on Mr. Jones' person after a day-long series of apparent sales of counterfeit was a significant issue in the case. This is particularly so in view of the fact that the only other genuine currency found in the house during the search (with the exception of the bills taped to sheets of paper for use as mock-ups) was the $20 that Ann Jones dropped as the officers entered the house.[14] The challenged testimony may have strayed beyond what was necessary to eliminate public assistance as the source of the money; at the same time, however, a limiting instruction designed to cabin the purposes for which the evidence could be considered might have been offered but was not. *Cf.* Tr. 1301–03.

### III.

For the reasons we have discussed, the convictions of Otto and Ann Jones are AFFIRMED.

RIPPLE, Circuit Judge, concurring in part and dissenting in part.

I join the judgment and the opinion of the court with respect to the appeal of Ann Jones. Regrettably, I must part company with my colleagues with respect to the appeal of Otto Jones. In my view, the cash found on his person was admitted erroneously and,

on the record in this case, cannot be overlooked as harmless error.

As the majority notes, the government attempts to justify the admission of the cash only on the theory that the investigators inevitably would have discovered the money in a search incident to the arrest of Mr. Jones prior to leaving the premises that evening. No attempt is made to justify, on the authority of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the initial patdown of Mr. Jones that yielded the money. The *Terry* exception has a "narrow scope," *Dunaway v. New York*, 442 U.S. 200, 210, 99 S.Ct. 2248, 2255, 60 L.Ed.2d 824 (1979), which the Supreme Court has been "careful to maintain." *Terry* justifies a patdown for weapons when the officer has "a reasonable belief" that the accosted individual is "armed and presently dangerous." *Ybarra v. Illinois*, 444 U.S. 85, 92–93, 100 S.Ct. 338, 343, 62 L.Ed.2d 238 (1979). Here the officers encountered Mr. Jones in a bathrobe and slippers at the front door of a home they were about to search pursuant to a warrant issued on probable cause that a counterfeiting operation was underway on the premises. This encounter is not perhaps comparable to the situation in *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), in which a lone police officer encountered, in a high crime district at night, a person believed by the officer to be armed. On the other hand, the situation in this case certainly counseled a great deal more caution than the one that confronted the officers in *Ybarra*. There a patdown of a bystander in a bar was held to be beyond the scope of *Terry*. The government's caution in not attempting to justify the patdown in this case on *Terry* grounds demonstrates commendable restraint, and, like my colleagues, I

---

ment counselor. Tr. 881. That disclosure was unprompted, however, and the government quickly redirected the witness away from that subject. The defense rejected a proposal that the jury be instructed to ignore this testimony, and opted instead to explore the matter further on cross-examination of the witness. Tr. 888–89, 899–900. Finally, we note that on cross-examination, Ann Jones conceded, in response to the government's questions, that she had lied to public aid authorities in order to receive benefits.

Those questions were permissible in order to test her credibility as a witness.

**14.** Ann Jones had purchased groceries earlier in the day; but following her return from the store, a number of additional apparent counterfeit sales took place, suggesting that she likely would have had more cash in the house than the $20 she dropped.

do not wish to be misunderstood as having decided the issue *sub silentio.*

Turning to the issue presented by the parties and decided by my colleagues—the applicability of the inevitable discovery doctrine—I note at the outset that there is no disagreement between myself and the majority about the standards applicable in an inevitable discovery situation. I agree that, in order to avail itself of this doctrine, the government must establish, by a preponderance of the evidence, that the officers would have discovered the currency in Mr. Jones' bathrobe pocket prior to leaving the premises on the night in question. To meet this burden, the government must establish that it had probable cause to effect Mr. Jones' arrest that evening.

As the majority demonstrates with meticulous attention to detail, there was certainly probable cause to arrest Ann Jones. She had been observed dealing in counterfeit currency at that residence. The search, conducted pursuant to a warrant, had yielded a great deal of evidence to support the investigator's belief that she. was dealing in counterfeit currency. The situation is starkly different with respect to Mr. Jones. No one disputes that, at the time of their entrance into the home, the investigators had no reason to believe that Mr. Jones had committed a crime. His attire indicated that he lived at the address. Nothing discovered after the entrance permitted a contrary conclusion. The placement of his clothing in the same bedroom as Ann Jones certainly indicated a familial relationship with the arrestee. It did not establish, however, his personal responsibility for the criminal activity.

The Supreme Court stressed in *Ybarra,* 444 U.S. at 91, 100 S.Ct. at 342, that the determination of probable cause must be made on an individual basis; the "mere propinquity" of an individual to another does not establish probable cause. This principle has been established in our law for a very long time. *Id.* at 94, 100 S.Ct. at 343–44. Application of this rule does require, of course, an evaluation of—to borrow a phrase of Justice

Jackson's from another context—the "practicalities and peculiarities"[1] of a situation. For instance, there certainly will be situations in which the proximity of individuals clearly indicates a working relationship in criminal activity. Indeed, such was the situation in the cases relied upon by the majority to support its conclusion. *See United States v. Pace,* 898 F.2d 1218, 1240 (7th Cir.) (non-residents present in a condominium during a drug transaction), *cert. denied,* 497 U.S. 1030, 110 S.Ct. 3286, 111 L.Ed.2d 795 (1990); *United States v. Jones,* 696 F.2d 479, 486 (7th Cir.1982) (arrest after armed struggle of two men in motel room filled with drugs and drug paraphernalia), *cert. denied,* 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983). By contrast, on the night in question, the only evidence uncovered by the investigating officers with respect to Mr. Jones established that he was a resident of the dwelling and was the spouse of the suspect. Neither status, resident or spouse, is contrary to the criminal law. Mr. Jones was under no obligation to abandon his home or his family.

What is particularly disturbing about today's holding is its breadth. The judiciary traditionally has recognized its obligation to ensure that the guilt of one spouse is not imputed to the other. *Cf. United States v. Castro,* 788 F.2d 1240, 1249 (7th Cir.1986) (commenting on the trial judge's care in ensuring that jury evaluated independently the evidence against each spouse). In this case, however, the court holds that, although "ultimately, the government must make an independent case for the spouse's culpability," it may establish probable cause to arrest a spouse by establishing awareness of the illegal activity and access to the tools of that activity which are kept in the home. This approach will no doubt result in the arrest and detention of a great number of spouses whose only "crime" is their lack of prudence, or foresight, in choosing a life partner. We need not speculate on the potential for abuse. Maltreatment of a spouse by law enforcement authorities in order to induce cooperation by a suspect is not an unknown occur-

---

1. *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

rence in this country or elsewhere. *See United States v. Talkington,* 843 F.2d 1041, 1049 (7th Cir.1988) (describing "strong suggestion in record" that threatened maltreatment of wife induced husband's consent to search home).

In my view, on that evening the investigating officers lacked probable cause to arrest Mr. Jones. Accordingly, the discovery of the money in his bathrobe was not inevitable. Nor, given the thin case against him, can I say that this error was harmless. Accordingly, I would reverse the judgment of conviction entered against Mr. Jones and would remand the case for further proceedings.